## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF GEORGIA,<br><br>*EX REL.* [UNDER SEAL],<br><br>         Plaintiffs,<br><br>vs.<br><br>[UNDER SEAL],<br><br>         Defendants. | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>Civil Action No. 15-cv-259 (Brody)<br><br>**AMENDED COMPLAINT**<br><br>Jury Trial Demanded |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF GEORGIA,<br><br>*EX REL.* TIFFANY MITCHELL,<br><br>Plaintiffs,<br><br>vs.<br><br>TURNING POINT CARE CENTER, INC., and UNIVERSAL HEALTH SERVICES, INC.,<br><br>Defendants. | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>Civil Action No. 15-cv-259 (Brody)<br><br>**AMENDED COMPLAINT**<br><br>Jury Trial Demanded |

Plaintiff and Relator TIFFANY MITCHELL ("Relator"), by and through her attorneys, state that this is an action brought by Relator against defendants TURNING POINT CARE CENTER, INC., ("TPCC") and UNIVERSAL HEALTH SERVICES, INC., ("UHS") (collectively, "Defendants") on behalf of the United States of America ("United States"), pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA"), and on behalf of the State of Georgia pursuant to the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq.* ("GFMCA").

### INTRODUCTION

1.     This is an action to recover treble damages and civil penalties on behalf of the United States of America and the State of Georgia arising from false statements or records and false or fraudulent claims made or caused to be made by Defendants Turning Point Care Center, Inc. ("TPCC") and Universal Health Services, Inc. ("UHS") to the United States of America and

1

the State of Georgia in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.* and in violation of the Georgia False Medicaid Claims Act, O.C.G. §§ 49-4-168 to 49-4-168.6.

2.     The False Claims alleged herein were made, used, or presented to defraud Government-funded health benefit programs, including, but not limited to, Medicare, Medicaid, the Federal Employees Health Benefits Program ("FEHBP"), TRICARE/CHAMPUS, and other programs of significant sums of money that should have been used to pay for the medical needs of eligible patients, but were instead used to reimburse Defendants for improperly billed services.

3.     Defendants caused the False Claims alleged herein to be presented, made or used, by improperly seeking reimbursement from Government-funded health benefit programs for unpaid deductibles, co-pays and co-insurance obligations of Medicaid-eligible patients without first undertaking reasonable collection efforts as required by the regulations.

4.     Defendants caused the False Claims alleged herein to be presented, made or used, by improperly billing for services rendered by non-physicians under a physician's provider number even though the services rendered were not "incident to" the services of a physician.

5.     In order to maximize their revenue and profits, Defendants also engaged in a pattern and practice of "upcoding," which is the improper use of a billing code for a medical procedure or diagnosis that results in a higher payment to the medical provider than that warranted by the true procedure or diagnosis.

## SUMMARY OF ALLEGATIONS

6.     Defendants' false claims alleged herein pertain to the submission of false or fraudulent claims to Government Funded Healthcare programs including, but not limited to, Medicaid, Medicare, TRICARE, and the Federal Employees Health Benefits Program, as well as

other Government-funded programs which resulted in reimbursements unlawfully received by the Defendants and others.

7.     For a healthcare provider to receive Medicare reimbursement for the unpaid deductibles, co-pays and co-insurance obligations, the provider must establish that "reasonable collection efforts were made." In the case of Medicaid-eligible patients, the provider must seek payment of the unpaid sums from the appropriate state Medicaid program. Only after the state Medicaid program denies payment, may the provider treat the unpaid sums as "bad debt" and seek Medicare reimbursement. In knowing violation of this regulatory framework, Defendants sought reimbursement from Government-funded health benefit programs for unpaid deductibles, co-pays and co-insurance obligations of Medicaid-eligible patients without first seeking payment from the Georgia Medicaid program.

8.     Healthcare providers may bill Medicare under a physician's provider number for services rendered by a non-physician provided that the service furnished by the non-physician be "incident to" the physician's professional services. Roughly, to qualify as "incident to" a physician's services, the service rendered by a non-physician must be part of the patient's normal course of treatment, during which the physician personally performed an initial service and remained actively involved in the course of treatment. Defendants knowingly and improperly billed Medicare and other Government-funded programs for services rendered by non-physicians under physician provider numbers though the services were not "incident to" the services of the physician under whose provider number they were billed.

9.     Common Procedural Terminology Codes ("CPT Codes") are 9-digit numbers used by healthcare providers to identify a medical service furnished to a patient and used by Medicare to determine the value of the remittance to the provider. Instead of always identifying

3

a service rendered to a patient by its correct CPT code, Defendants regularly and knowingly billed Medicare for services by utilizing false CPT codes that resulted in higher payments to the medical provider than that warranted by the true service rendered.

10.     Defendants have caused the United States to incur substantial damages by presenting, making, using or causing to be presented, made or used hundreds (if not thousands) of False Claims to Government Health Programs including, but not limited to, Medicare, Medicaid, FEHBP and TRICARE/CHAMPUS, as well as other Government-funded programs, in connection with the schemes alleged herein.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 31 U.S.C. § 3730, and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to the FCA.

12.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and Defendants have sufficient minimum contacts with the United States.

13.     Venue is proper in the Eastern District of Pennsylvania, pursuant to 31 U.S.C. § 3732(a) because UHS' principal place of business is located in this judicial district, Defendants transact business within this district and certain of the conduct alleged herein occurred within the District.

14.     In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed *in camera*, shall remain under seal for a period of at least sixty (60) days, and shall not be served upon Defendants until the Court so orders.

15.     In accordance with 31 U.S.C. § 3730(b)(2), Relator provided the Government with a copy of this Complaint and a written disclosure of substantially all material evidence and information in their possession either before or contemporaneously with the filing of this Complaint.  More specifically, Relators complied with this provision by serving copies of this Complaint and such written disclosure upon Charles Byrd, Assistant United States Attorney for the Middle District of Georgia, and Eric H. Holder, Jr., United States Attorney General.

## THE PARTIES

A.      **The Relator**

16.     Realtor Tiffany Mitchell ("Mitchell") is a resident of the State of Georgia.

17.     Prior to her unlawful termination in July of 2013, Mitchell had worked for Defendants for approximately 17 years.  She began working for UHS subsidiary Lakeside Behavioral Health ("Lakeside") in Memphis, Tennessee in 1994 as an admissions clerk.  She advanced through the ranks to eventually become a billing specialist at Lakeside in 1997.

18.     As a healthcare billing specialist, Relator acquired extensive experience in the proper billing procedures for Medicare, Medicaid and other Government-funded health programs.

19.     In 2011, Relator accepted a position with UHS subsidiary Turning Point Care Center in Moultrie, GA as the business office director.  In this position, Relator was responsible for supporting the Chief Financial Officer Edwin Bennett, overseeing the daily functions of claims billing, collections and denial of claims. She was familiar with proper Medicare and Medicaid procedures and regulations.

20.     Over the course of her employment at TPCC, Relator became aware of several billing violations of Medicare, Medicaid and other Government-funded healthcare programs.  As

discussed in more detail below, Relator brought these violations to the attention of TPCC's CFO Edwin Bennett on several different occasions. Bennett repeatedly dismissed her concerns and in July 2013 he eventually terminated her employment.

21. Mitchell's personal knowledge of the violations alleged in this Complaint was acquired during the course of her employment with TPCC.

22. Relator is unaware of any "public disclosure" in connection with the false claims alleged in this Complaint, as defined in 31 U.S.C. § 3730(e)(4)(A). In any event, Relator is an "original source" because she has knowledge that is both direct and independent of any public disclosures (to the extent they may exist). Relator also has knowledge that is both independent of and materially adds to any publicly disclosed allegations or transactions, which may exist.

23. Relator has voluntarily provided the Government with substantially all of the relevant information in her possession.

24. Relator brings this action for violations of the FCA on behalf of herself and the United States pursuant to 31 U.S.C. § 3730(b)(1).

25. Relator also brings this action for violations of the GFMCA on behalf of the State of Georgia.

**B.**     **The Defendants**

26. Defendant UHS is a Delaware corporation with its main corporate headquarters in King of Prussia, Pennsylvania.

27. UHS was founded in 1978 by Chairman and Chief Executive Officer ("CEO") Alan B. Miller and is currently ranked 337th on the 2013 Fortune 500 list. It is a public company traded on the New York Stock Exchange under the symbol 'UHS.'

28.     UHS' principal business is owning and operating, through its subsidiaries, acute care hospitals, behavioral health centers, surgical hospitals, ambulatory surgery centers and radiation oncology centers.  As of March 2013, UHS owned or operated 23 acute care hospitals and 197 behavioral health centers in 37 states, Washington, D.C., Puerto Rico and the United States Virgin Islands.

29.     UHS is highly reliant on business from Medicare-eligible patients as Medicare reimbursement represented 40% and 39% of the Company's net service revenue in 2011 and 2012, respectively.

30.     TPCC is a subsidiary of UHS, located in Moultrie, GA and incorporated under the laws of the State of Georgia.

31.     TPCC offers both inpatient and outpatient services to adults who suffer from behavioral health disorders and substance abuse.

32.     Approximately 90-95% of TPCC's patients are Medicare-eligible.

## GENERAL ALLEGATIONS

### A.     The Federal False Claims Act

33.     Originally enacted in 1863, the FCA was substantially amended in 1986 by the False Claims Amendments Act to facilitate enforcement and recovery by the United States and to encourage private enforcement by *qui tam* plaintiffs (often referred to as "relators").  Under the version of the FCA adopted by the False Claims Amendments Act, liability is imposed on any person who:

   a.  knowingly presents, or causes to be presented, to an officer or employee of the United States Government a false or fraudulent claim for payment or approval;

   b.  knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

    c.  conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; or

    d.  knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

*See* 31 U.S.C. § 3729(a)(1), (2), (3) and (7).

    34.    On May 20, 2009, the FCA was again amended pursuant to the Fraud Enforcement and Recovery Act of 2009 ("FERA"). A person is liable for violation of the FCA, as amended by FERA, if the person:

    a.  knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    b.  knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

    c.  conspires to commit a violation of 31 U.S.C. § 3729(a)(1); or

    d.  knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

*See* 31 U.S.C. § 3729(a)(1)(A), (B), (C) and (G).

    35.    For purposes of the FCA, as amended by FERA, "knowing" or "knowingly" means that the defendant "(i) has actual knowledge of the falsity of the [relevant] information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. *Id.*

    36.    The word "material" is defined under the FCA, as amended by FERA, as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

37.     The FCA, as amended by FERA, further provides that liability under the act shall include "a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . [for each unlawful act], plus 3 times the amount of the damages which the Government sustains because of the act . . . ." *See* 31 U.S.C. § 3729(a)(1).

**B.     Government Health Programs**

38.     Medicare is a Federal Government-funded health program primarily benefiting the elderly, which was created in 1965 with the adoption of Title XVIII of the Social Security Act.  It is administered by the federal Health Care Financing Administration ("HCFA"), now known as Center for Medicare and Medicaid Services ("CMS")..

39.     Medicaid is a joint federal-state health benefits program generally available to needs based adults and their children, as well as individuals with certain disabilities.  While Medicaid is administered by the States (or State subcontractors), it is funded jointly by both the States and the Federal Government.

40.     The FEHBP is a collection of individual health care plans, including the Blue Cross and Blue Shield Association, Government Employees Hospital Association and Rural Carrier Benefit Plan, which provide health insurance coverage for federal employees, retirees and their dependents.

41.     TRICARE is the United States military's health care system, designed to maintain the health of active duty service personnel, provide healthcare during military operations, and offer healthcare to non-active duty beneficiaries, including dependents of active duty personnel, military retirees and their dependents.

42.     CHAMPUS, or the Civilian Health and Medical Program of the Uniformed

Services, provides reimbursements to military families who must obtain care from civilian medical providers when care at a military hospital or clinic is not available.

43.     The VA operates a healthcare system separate from TRICARE/CHAMPUS. Through its Veterans Health Administration, the VA provides medical and related care to over 7.9 million eligible veterans.

44.     Generally, those eligible for coverage under both VA programs and Medicare must choose between the two programs each time they obtain services.  So long as they do not qualify for TRICARE, veterans' surviving dependents may be eligible to receive care through the VA system under the Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA").

45.     The VA provides most of its services through VA-owned and operated hospitals, nursing facilities, outpatient clinics and other healthcare service providers.  In situations where eligible veterans obtain authorized care from non-VA facilities or providers, the VA makes payment or reimbursement determinations using methodologies similar to those used by Medicare.

C.     **The Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 _et seq._ ("GFMCA")**

46.     Like the FCA, the GFMCA is generally designed to allow states to recover damages incurred as a result of False Claims made, used, presented, or caused to be made, used, or presented, by a defendant.

47.     The GFMCA is implicated when False Claims are made, used, presented, or caused to be made, used, or presented, to Government Health Programs funded in whole or in part by the States, including, but not limited to, Medicaid.

48.     Among other things, the GFMCA provides that any person who knowingly

presents or causes to be presented false or fraudulent claims, for payment or approval to the Georgia Medicaid program is liable for a civil penalty ranging from $5,500 up to $11,000 for each false or fraudulent claim, plus up to three times the amount of damages sustained by the Georgia Medicaid program.

49.     Under the GFMCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information.  Knowledge by the defendant is established without regard as to whether the defendant intended to defraud the State.

50.     The GFMCA further provides for liability for those who conspire to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid.

51.     The GFMCA also protects relators form retaliatory termination by "entitl[ing] to all relief necessary to make [the relator] whole, if that [relator] is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by [the relator] in furtherance of a civil action under the [GFMCA] or other efforts to stop one or more violations [thereof.]"  GFMCA §49-4-168.4(a).

D.     **Regulatory Framework**

1.     **Medicare Reimbursement of Bad Debts for Dual Eligible Patients**

52.     As Medicare and Medicaid are public assistance programs benefiting the elderly and the economically disadvantaged respectively, some elderly economically disadvantaged are "dual eligible" under both Medicaid and Medicare.

53.     In states where Medicaid does not fully pay for dually eligible beneficiaries'

deductibles or coinsurance obligations, providers may claim the difference as a bad debt for purposes of Medicare reimbursement.  According to Chapter 3 of the *Provider Reimbursement Manual (PRM)*, and title 42 of the *Code of Federal Regulations*, § 413.89, a Medicare bad debt must meet certain minimum requirements if it is to be reimbursed.  It must meet the following criteria:

(1) The debt must be related to covered services and derived from deductible and coinsurance amounts.

(2) The provider must establish that reasonable collection efforts were made.

(3) The debt was actually uncollectible when claimed as worthless.

(4) Sound business judgment established that there was no likelihood of recovery at any time in the future.

54.     CMS provides further interpretive guidance through *PRM* §§310, 312 and 322. Section 310 defines a "reasonable collection effort" as an effort similar to what a provider would make to collect amounts owed by non-Medicare patients and "must involve the issuance of a bill."  It also states that the "provider's collection effort should be documented" with "copies of the bill(s)." Section 312 relieves providers from billing indigent patients directly, but this does not imply that providers may simply treat such unpaid sums as bad debts and seek Medicare reimbursement.  Proper procedure for such cases is described in §322.

55.     Section 322 provides that any portion of Medicare co-payments and deductibles owed and not paid for by dual-eligibles and for which the state is not responsible, may be claimed as Medicare bad debt.  However, where "a State is obligated by statute or under the terms of its [Medicaid] plan to pay all, or any part, of the Medicare deductible or coinsurance amounts, these amounts are not allowable as bed debts under Medicare." In other words, where

a state may be liable for coinsurance and deductible debt not paid by the patient, bad debt can be reimbursed only and to the extent that the state does not pay.

### 2.   Billing for Services Incident to a Physician's Services

56.   Under certain limited and proscribed circumstances, healthcare providers are permitted to bill Medicare for services rendered by a non-physician under the physician's provider number and thereby receive reimbursement for the service. 42 C.F.R. §405.2413. Regulations require that the service furnished by the non-physician must be "incident to" the physician's professional services.

57.   The relevant portion of the regulation reads:

Services and supplies incident to a physician's professional service are reimbursable ... if the service or supply is:

> (1)   Of a type commonly furnished in physicians' offices;
>
> (2)   Of a type commonly rendered either without charge or included in the health clinic's bill;
>
> (3)   Furnished as an incidental, although integral, part of a physician's professional services;
>
> (4)   Furnished under the direct, personal supervision of a physician; and
>
> (5)   In the case of a service, furnished by a member of the clinic's health care staff who is an employee of the clinic.

Id.

58.   To qualify as "incident to," services must be part of the patient's normal course of treatment, during which the physician personally performed an initial service and remained actively involved in the course of treatment.

13

59.     While the physician need not be physically present in the treatment room while the services are provided, but he or she must provide direct supervision. The physician must be present in the office suite to render necessary assistance.

60.     These limitations apply to all services furnished by non-physicians including physician assistants and nurse practitioners.

### 3.     CPT Codes for billed Medical Services

61.     In general, Medicare reimbursement for physician services operates on the basis of a fee schedule where the value of the reimbursement is based on the lesser of (A) the actual fee charged or (B) an amount determined under a fee schedule. 42 U.S.C. §1395w-4.  The fee schedule is published by the Department of Health and Human Services ("HHS") and lists prices for defined services calculated according to a specific regulatory formula.  42 C.F.R.§ 414.20.

62.     To facilitate uniform billing practices across the industry, CMS "establishes uniform national definitions of services" and "codes to represent services." 42 C.F.R.§ 414.20. These codes are assigned to every task and service a medical practitioner may provide to a patient including medical, surgical and diagnostic services. The CPT codes are uniformly utilized by all healthcare payers, and are vital to the Government in determining the amount of reimbursement that a provider may receive.

63.     The CPT codes for the Behavioral Health Services frequently rendered at and billed for by TPCC include the following:  90791 (Diagnostic interview with no medical); 90292 (Diagnostic interview with medical); 90791 (Interactive diagnostic interview with no medical); 90792 (Interactive diagnostic interview with medical); 90832, (Psychotherapy 30 minutes); 90834 (Psychotherapy 45 minutes); 90837 (Psychotherapy 60 minutes); 90833 (Psychotherapy 30 minutes, with Evaluation and Management); 90836 (Psychotherapy 45 minutes, with

14

Evaluation and Management); 90838 (Psychotherapy 60 minutes, with Evaluation and Management); 90853 (Group Psychotherapy).

64.     CPT Codes for Behavioral Health Services were revised during the relevant time period—i.e. the period during which the Defendants engaged in the improper practices described below, a period which predates Relator's employment at TPCC and extends to the present. Specifically, the CPT codes used by the Defendants to improperly bill Medicare for services rendered to eligible patients were revised in January 2013.  The codes relayed here in the main text are current, as of January 2013.  Older codes can be found in CPT Codes for common Behavioral Health Professional Services.

65.     Prior to January 2013, CPT codes distinguished between 20 and 30 minute individual psychotherapy as well as between Interactive and non-interactive individual psychotherapy.  Previous CPT codes were: 90804 (20 minute Individual Psychotherapy); 90816 (30 minute individual psychotherapy); 90810 (20 minute Interactive Individual Psychotherapy); 90823 (30 minute Interactive Individual Psychotherapy).

66.     As stated above, UHS' principal business is owning and operating, through its subsidiaries, acute care hospitals, behavioral health centers, surgical hospitals, ambulatory surgery centers and radiation oncology centers.   TPCC, a subsidiary of UHS, offers both inpatient and outpatient services to adults who suffer from behavioral health disorders and substance abuse.  These entities are highly reliant on business from Medicare-eligible patients. Both have engaged in improper conduct in this matter.

## SPECIFIC ALLEGATIONS

### A.    Defendants' Improper Conduct

**1.    Defendants did not seek payment from the appropriate state program before seeking Medicare reimbursement for the unpaid amount.**

67.    TPCC improperly billed Medicare for the unpaid medical and medical insurance bills of patients who were dual-eligible for both Medicare and Medicaid.

68.    As stated above, the proper procedure for collecting outstanding amounts on the accounts of dual-eligible patients is to first bill the state Medicaid program and then to report any outstanding balance to Medicare as a bad debt.

69.    During her time as an employee of TPCC, Relator learned that it a common practice of the Defendants to attempt to collect unpaid fees directly from the dual-eligible patient, wait 120 days and then rely on the presumption of non-collectability under *PRM* §310.2 to submit a claim for reimbursement from Medicare.

70.    In circumventing the proper regulatory procedures in this manner, TPCC submitted or caused to be submitted claims for Medicare reimbursement which were false insofar as they either expressly or impliedly stated they were being submitted in compliance with the regulations.

71.    On or about May 2011, Relator informed TPCC's Chief Financial Officer ("CFO") Edwin Bennett ("Bennett") that proper Medicare and Medicaid billing procedures for dual-eligibles were not being followed.  Mr. Bennett indicated that he was aware of the improper practice, but that he endorsed it because TPCC lacked the manpower to follow proper billing procedures.

72.    Relator recalls that Mr. Bennett told her that she should get used to the way things were done at TPCC and that this was simply one of those things that "you do now and ask

16

for forgiveness later."  Relator also recalls Mr. Bennett telling her that if Medicare were to discover the TPCC's improper conduct and asses a fine, TPCC would "just pay the fine."

73.     In or around August 2012, at Bennett's direction, Relator took her concerns about the Defendants' improper billing procedures to Wayne Edwards, TPCC's Senior Manager of Reimbursement.   Relator asked Edwards about the scope of TPCC's billing practice of circumventing the necessary step for seeking payment from the state agency.

74.     Specifically, Relator questioned the TPCC practice with respect to Medicare patients who are dual-eligible for Georgia Medicaid and asked whether the same practice should be followed with respect to patients who were dual-eligible for Maryland Medicaid:   "I understand that for Medicare patients with GA Medicaid as secondary we do not bill GA Medicaid. Does this apply to Medicare patients with Maryland Medicaid?"  Acknowledging the improper billing practice, Edward replied: "We should bill Maryland under their Medicaid number. *Georgia is a unique situation.*" (emphasis added).

75.     Relator's understanding is that TPCC viewed Georgia as a "unique situation" because the Georgia Medicaid Office failed to provide denials in an acceptable form so that TPCC could eventually be reimbursed by Medicare.

76.     TPCC believed that following the proper procedure for reporting bad debts to Medicare meant that TPCC would not receive Medicare reimbursement for unpaid deductibles, co-pays and co-insurance obligations of dual-eligible patients. Thus, requiring, in their mind, the need to circumvent the process altogether.

77.     TPCC's solution to this serious issue was to improperly circumvent the proper procedure for reporting bad debts to Medicare.  Instead of billing the state Medicaid program for

these obligations, TPCC billed the patient directly and then reported any unpaid amount after 120 days to Medicare for reimbursement.

78.     TPCC improperly failed to seek payment from Georgia Medicaid for unpaid sums incurred by dual-eligible patients before seeking reimbursement from Medicare, and it did so knowing that such a practice was improper.

> **2.     Defendants improperly billed Government-funded programs for non-physician services.**

79.     During her time at TPCC, Relator also learned of unlawful billing practices involving the improper use of physicians' provider numbers to bill Medicare for services rendered by non-physicians.  While Medicare regulations do allow providers to bill for certain limited services rendered by a non-physician under a physician's provider number when the service is rendered "incident to" professional services rendered by the physician, TPCC failed to follow the explicit limitations on this regulatory provision.  This requirement is intended to ensure that patients receive treatment from a qualified healthcare provider.

80.     One example of this improper billing practice is documented in various emails exchanged between the Relator and Dr. Wanda Gobin of TPCC in or around April 2013.  Upon learning that TPCC was using her provider number to bill for services rendered by recently hired nurse practitioner Tonya Miller, Dr. Wanda Gobin objected to the practice.

81.     Dr. Gobin objected specifically to TPCC's use of her provider number to bill for services rendered by Tonya Miller at a time when Dr. Gobin was not present in the facility at which the services were rendered.

82.     Relator informed Dr. Gobin that it was TPCC's practice that services rendered by Ms. Miller were to be billed under Dr. Gobin's provider number.  Despite Dr. Gobin's

objections, TPCC continued to improperly bill for services rendered by Miller under Dr. Gobin's provider number.

83.    TPCC's improper billing practices involving Dr. Gobin, Miller and others were widespread.  Indeed, it was general practice at TPCC to bill for services by non-physicians—e.g. nurse practitioners, psychologists, etc.—under the provider number of a physician - no matter what treatment was rendered.

84.    In one further example of this improper practice, which the Relator specifically recalls, TPCC billed for non-physician services under the provider number of Dr. Henry Eugenio despite the fact that the services were not "incident to" Dr. Eugenio's physician services.  In many cases Dr. Eugenio was not present at the facility at the time the non-physician services in question were rendered.

### 3.    Defendants improperly "upcoded" services furnished to patients under Government-funded programs.

85.    It was also a widespread practice at TPCC for doctors to "up-code" patient visits.

86.    "Up-coding" refers to the improper use of a billing code for a medical procedure or diagnosis that results in a higher payment to the medical provider than that warranted by the true procedure or diagnosis.

87.    Healthcare providers use specific codes to bill Medicare for particular services performed.  As previously stated, the coding system used is called the CPT: CPT codes are 9-digit numbers used by providers to uniquely identify a medical service furnished to a patient and used by Medicare to determine the value of the remittance to the provider.

88.    Defendants routinely engaged in "up-coding" as a way of unlawfully increasing the value of Medicare payments to TPCC.  This practice was widespread and included, but was

not limited to, billing Medicare for diagnostic interviews and psychotherapy sessions by using CPT codes that misrepresented the medical service actually rendered.

89.     In one of many examples, Relator recalls an incident where the patient received a 30 minute individual psychotherapy session (90832), but TPCC submitted a false claim billing to Medicare for a 45 minute individual psychotherapy session (90834). This was widespread.

90.     In another example, Relator recalls an incident where a patient received a 45 minute individual psychotherapy session (90834), but TPCC submitted a false claim billing Medicare for a 45 minute individual psychotherapy session with evaluation and maintenance (90836 + E&M code). This was also widespread.

91.     Additional CPT codes implicated in TPCC's unlawful scheme include, but are not limited to CPT codes for diagnostic interviews (90791, 90792), individual psychotherapy sessions of various lengths (90832, 90834, 90837), including psychotherapy sessions paired with evaluation and maintenance (90833, 90836, 9038), group psychotherapy (90853).

92.     Also implicated are the pre-2013 codes for these same services: diagnostic interviews (90801), individual psychotherapy sessions of various lengths (90802, 90804, 90816, 90806, 90818, 90808, 90821, 90810, 90823, 90812, 90826, 90814, 90828), including psychotherapy sessions paired with evaluation and maintenance (90805, 90817, 90807, 90819, 90809, 90822, 90811, 90824, 90813, 90827, 90815, 90829), and group psychotherapy (90853, 90857).

93.     The practice of "upcoding" is so rampant at TPCC that doctors' bills routinely reflect more hours spent with patients than the doctor spends at TPCC altogether on a given day.

### 4.   Retaliatory Termination

94.    Since her first efforts in or around May 2011, to alert Bennett to the problems with TPCC's improper billing practices, Relator was repeatedly told by Bennett not to try to change the way things had been done at TPCC and to go along with the scheme. Despite these warnings, and in the face of Bennett's evident displeasure at Relator's questioning TPCC's improper billing practices, Relator tried several times over the course of her employment at TPCC to voice her concerns and to correct TPCC's improper practices.

95.    Due to her attempts at discussing TPCC's improper practices with CFO Bennett and other supervisors at TPCC, Relator faced a difficult work environment shortly after she first arrived at TPPC in 2011.

96.    In addition to bringing her concerns to Bennett, Relator also attempted to rectify the unlawful practices by offering to re-train certain of her subordinates in the billing department in proper billing procedures. For example, on at least one occasion in or around March 2013, TPCC employee JoBeth Burk expressed concern to Relator about not having the Medicaid denial information required in a proper Medicare bad debt reimbursement request. Though CFO Bennett had specifically instructed the billing department to not bill Medicaid, Relator offered to instruct Burk how to properly bill Medicaid, as required by CMS, for the portion of a dual-eligible patient's bill not covered by Medicare. This way, Burk would have the correct denial information she needed when requesting Medicare reimbursement.

97.    Due to the environment at the institution, Burk declined Relator's offer.

98.    In the months leading up to Relator's termination in July 2013, what Relator initially experienced as an unwelcoming environment turned positively antagonistic. In response

to Relator's repeated attempts to have TPCC rectify its improper billing practices, CFO Bennett began documenting alleged complaints and shortcomings with Relator's job performance.

99.     It was around this time, in the spring of 2013, that Relator noticed that someone was going through her desk and her workspace when she was not present.  Relator believes that management and others, at management's direction, were altering Relator's work, purposely introducing errors to provide justification for Relator's termination.

100.    On July 9, 2013, Mr. Bennett took direct action against Relator for her attempts to stop the improper billing practices at TPCC by terminating her employment.  Relator was offered a severance package in exchange for signing a release which stated, in relevant part, that Relator was "not aware of any wrongdoing, illegal acts or fraud by the Employer or any Releasee and [has] not been retaliated against for reporting any allegations of wrongdoing by the Employer or any Releasee."  Given the circumstances detailed above, Relator refused to execute and return the release.

**B.      Defendants' Unlawful Practices Exposed Patients to Unnecessary Harm**

101.    Defendants' improper billing practices led to significant sums of money that should have been used to pay for the medical needs of eligible patients being used, instead, to reimburse Defendants for improperly billed services.

102.    The diversion of Government funds caused by the Defendants' improper billing practices, from its intended use of paying for medical services for eligible individuals exposes patients to unnecessary harm by affecting the availability of Government aid to eligible individuals in paying for necessary medical services.

103.    Further, Defendants' practice of billing Medicare/Medicaid dual-eligible patients directly for unpaid deductibles, co-pays and co-insurance obligations instead of billing the

appropriate state Medicaid program exposed those patients to unnecessary harm, such as the mental anguish and stress of being the subject of debt collection efforts by one's healthcare provider in addition to the general stress of addressing healthcare issues without the benefit of the correct healthcare providers.

### C.   Damages Sustained By The Government As A Result of Defendants' Conduct

104.   Defendants' improper billing practices (including the conduct set forth above) have been pervasive.

105.   Due to Defendants' improper billing practices (including the conduct set forth above), money intended to benefit individuals eligible for government-funded health programs was instead diverted to improperly benefit the Defendants.

106.   The United States and the State of Georgia have been directly damaged by Defendants' misconduct.

107.   Defendants repeatedly and consistently submitted False Claims to Government Health Programs in violation of federal and state law including, but not limited to, the FCA and the GFMCA.

108.   Defendants' False Claims were made, used, presented, or caused to be made, used or presented, with the intent to gain an unfair economic benefit at the expense of Government Health Programs and law-abiding taxpayers.

109.   Government Health Programs including, but not limited to, Medicare and Medicaid, reasonably relied upon the False Claims by Defendants to their detriment.

110.   Had the Government been aware of Defendants' unlawful practices and methodologies, the False Claims submitted by Defendants would not have been paid.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)

111.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

112.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1).

113.    As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

### SECOND CAUSE OF ACTION
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

114.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

115.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

116.    As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(2)**

117.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

118.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(2).

119.    As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**

120.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

121.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims within the meaning of 31 U.S.C. § 3729(a)(1)(B).

122.    As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(3)**

123.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

124.     Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Government by getting false or fraudulent claims allowed or paid to in violation of 31 U.S.C. § 3729(a)(3).

125.     As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

### SIXTH CAUSE OF ACTION
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(C)**

126.     Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

127.     Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to commit violations of the FCA within the meaning of 31 U.S.C. § 3729(a)(1)(C).

128.     As a result of Defendant' 'conduct, the United States has been damaged in an amount to be proven at trial.

### SEVENTH CAUSE OF ACTION
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(7)**

129.     Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

130.     Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease its obligations to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(7).

131.    As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

### EIGHTH CAUSE OF ACTION
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(G)**

132.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

133.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used, false records or statements material to its obligations to pay or transmit money or property to the Government, and/or knowingly concealed or knowingly and improperly avoided or decreased its obligations to pay or transmit money or property to the Government, within the meaning of 31 U.S.C. § 3729(a)(1)(G).

134.    As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

### NINTH CAUSE OF ACTION
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(D)**

135.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

136.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants possessed or controlled property or money used, or to be used, by the Government and knowingly delivered, or caused to be delivered, less than all of that property or money within the meaning of 31 U.S.C. § 3729(a)(1)(D).

137.    As a result of Defendants' conduct the United States has been damaged in an amount to be proven at trial.

## TENTH CAUSE OF ACTION
### Federal False Claims Act
### 31 U.S.C. § 3730(h)

138.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

139.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants discharged, threatened, harassed and/or discriminated against the Relator in the terms and conditions of her employment after she lawfully reported what she believed to be fraudulent conduct or wrongdoing to her supervisors in violation of 31 U.S.C. §3730(h).

## ELEVENTH CAUSE OF ACTION
### Georgia False Medicaid Claims Act
### Ga. Code Ann. §§ 49-4-168.1(a)(1), (2), (3) and (7)

140.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

141.    This is a claim for treble damages and penalties under the GMFCA.

142.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Georgia State Government for payment or approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

143.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Georgia State Government to approve and pay false and fraudulent claims, in violation of Ga. Code Ann. § 49-4-168.1(a)(2).

144.    Through the acts more particularly set forth in the foregoing paragraphs,

Defendants conspired to defraud the Georgia State Government by inducing it to approve and pay false and fraudulent claims, in violation of Ga. Code Ann. § 49-4-168.1(a)(3).

145.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the Georgia State Government, in violation of Ga. Code Ann. § 49-4-168.1(a)(7).

146.    The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' improper billing practices.

147.    As a result of Defendants' conduct, the State of Georgia has been damaged, and continues to be damaged, in an amount to be determined at trial.

148.    The State of Georgia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or

**TWELFTH CAUSE OF ACTION**
**Georgia False Medicaid Claims Act**
**Ga. Code Ann. § 49-4-168.4**

149.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

150.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants discharged or otherwise discriminated against the Relator in the terms and conditions of her employment because of lawful acts she undertook in furtherance of this civil action or other efforts to stop one of more of the Defendants' violations.  Ga. Code Ann. § 49-4-168.4

151.    Relator is entitled to reinstatement with the same seniority status she would have

had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.

## PRAYER FOR RELIEF

**WHEREFORE,** Relator, on behalf of the United States, demands judgment against Defendants, ordering that:

    a. Defendants pay an amount equal to three times the amount of damages that the United States has sustained because of Defendants' actions which Relator currently estimate to be in the millions of dollars, plus a civil penalty of not less than $5,500 and not more than $11,000, or such other penalty as the law may permit and/or require, for each violation of 31 U.S.C. § 3729 *et seq.*;

    b. Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730 and/or any other applicable provision of law;

    c. Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3730 and/or any other applicable provision of law;

    d. Defendants pay a civil fine of $25,000, or such other penalty as the law may permit and/or require, for each violation of the Anti-Kickback Statute; and

    e. Relator be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relator, on behalf of the State of Georgia, demands judgment against Defendants, ordering that:

    a. Defendants pay an amount equal to three times the amount of damages that the State of Georgia has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000, or such other penalty as the law may permit and/or require, for each violation of the GFMCA;

    b. Relator be awarded the maximum amount allowed pursuant to the GFMCA and/or any other applicable provision of law;

    c. Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by GFMCA and/or any other applicable provision of law; and

    d. Relator be awarded such other and further relief as this Court may deem just and

proper.

**WHEREFORE,** Relator, on her own behalf, demands judgment against Defendants, ordering that:

a.  Defendants pay her two times the amount of back pay with appropriate interest;

b.  Defendants pay her compensation for special damages sustained by her in an amount to be determined at trial;

c.  Defendants pay her litigation costs and reasonable attorneys' fees in connection with her claim under 31 U.S.C. §3730(h) and Ga. Code §49-4-168.4;

d.  Defendants pay her any punitive damages as may be awarded under applicable law.

## DEMAND FOR JURY TRIAL

Relators hereby demand a trial by jury as to all issues.

Dated: January 28, 2015

By: _____

William L. Hurlock, Esq.
MUELLER LAW LLC
363 Bloomfield Avenue
Suite 2-C
Montclair, New Jersey 07042
Telephone:  (973) 233-8290
Facsimile: (973) 509-9521
William.Hurlock@muellerlaw.com

Mark R. Mueller, Esq.
MUELLER LAW PLLC
404 W. 7th St.
Austin, TX 78701
Telephone: (512) 478-1236
Facsimile: (512) 478-1473
Mark@muellerlaw.com

Christopher P. Furlong, Esq.
MUELLER LAW LLC

31

P.O. Box 380353
Cambridge, MA 02238
Telephone: (857) 756-5390
Christopher.furlong@muellerlaw.com

*ATTORNEYS FOR RELATOR*